UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
                                                              :
CHRISTOPHER CLARKE,                                           :
                                                              :
                              Plaintiff,                      :
                                                              :
              -v-                                             :        24 Civ. 596 (JPC)
                                                              :
PASSFEED, INC., *et al.*,                                     :        OPINION AND ORDER
                                                              :
                              Defendants.                     :
                                                              :
-----------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Plaintiff Christopher Clarke brings this action against his former employer, Passfeed, Inc. ("Passfeed"), Passfeed's Chief Executive Officer Richard Wang, and Passfeed's former Global Human Resources Director Erin Boose (collectively, "Defendants"). Clarke asserts that Defendants discriminated against him on the basis of his race, and then retaliated against him for speaking out about such discrimination, in violation of 42 U.S.C. § 1981 and various provisions of the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL"). Defendants now move for summary judgment on all of Clarke's claims. For reasons explained below, the Court grants summary judgment to Boose on Clarke's claim for retaliation under Section 1981 but otherwise denies Defendants' motion. Clarke is further ordered to show cause by April 30, 2026, why the Court should not dismiss his claims for direct discrimination under Section 1981 and for violations of the NYSHRL and the NYCHRL.

## I. Background

**A.    Facts**[1]

Passfeed is an international financial-processing company that works with consumers, small businesses, and commercial banks.  Defts. 56.1 Stmt. ¶ 1.  In January 2023, Clarke, a black man, was hired by Passfeed's New York City office as an "AML/KYC specialist"—a role which verifies customers' information to determine whether they can use United States banks.  *Id.* ¶¶ 7, 18.

In applying to work at Passfeed, Clarke submitted a resume with a "Work Experience" section listing his past positions at financial institutions including Barclays, Webster Bank/Sterling National, TD Bank, Valley Bank, and First Commerce Bank, and an "Education" section listing Bergen Community College and Seton Hall University.  Dkt. 77 ("Fingerhut Decl."), Exh. 2 ("Resume").  Under "Bergen County Community College," the resume reads "Associates Degree," and then, on the next line down, "Major: Criminal Justice | 3.2 GPA."  *Id.* at 2.  Under "Seton Hall University," the resume reads "Bachelor's Degree | December 2022," and, on the next line down, "Major: Criminal Justice."  *Id.*  Clarke did, in fact, graduate with an associate's degree from Bergen County Community College in August 2021.  Defts. 56.1 Stmt. ¶¶ 3-4.  But although Clarke attended Seton Hall University in 2015 and 2016, *id.* ¶ 5, he left Seton Hall University "around 2017 because the money ran out," and thus never received a bachelor's degree.  Fingerhut Decl., Exh. 1 ("Clarke Dep. Tr.") at 17:24-18:14.

---

[1] The facts throughout this Opinion and Order are drawn from Defendants' statement of undisputed material facts under Local Civil Rule 56.1(a), Dkt. 68 ("Defts. 56.1 Stmt."), Clarke's counterstatement under Local Civil Rule 56.1(b), Dkt. 75 ("Pl. 56.1 Counter Stmt."), Defendants' response to Clarke's counterstatement, Dkt. 82 ("Defts. 56.1 Response"), and the declarations and exhibits filed by the parties.  Unless otherwise noted, the Court cites only to Defendants' statement of undisputed material facts when Clarke does not dispute the fact, has not offered admissible evidence to refute it, adds his own "spin" on the fact, or otherwise disputes the inferences drawn from it.

Clarke testified at his deposition that, before he was hired, he disclosed to Subham Singhania, a Talent Acquisition Manager at Passfeed, that his resume's December 2022 date for a bachelor's degree from Seton Hall University was an "anticipated graduation date" that had "changed." *Id.* at 39:23-40:5. Singhania responded by assuring Clarke that a bachelor's degree was "not required" for the position. *Id.*; *see also* Fingerhut Decl., Exh. 20 (6/12/2024 email from Singhania stating that "before the interview Mr. Clarke disclosed that the graduation date listed on his resume was outdated due to personal reasons requiring him to take time off school," that Singhania "confirmed with Mr. Clarke that the role he was applying for did not require a completed Bachelor's degree, only that it was a preferred qualification," and that Clarke was hired "[b]ased on [his] strong performance in the interview[ and] his relevant skills & experience").

On February 2, 2023, shortly after he was hired, Clarke was promoted to the position of Chief Compliance Officer. Dkt. 72 ("Motion"), Exh. 6 (2/2/2023 email from a human resources manager stating that she was "pleased to announce that Christopher Clarke has earned a well-deserved promotion to Chief Compliance Officer . . . effective February 3, 2023"). Clarke asserts that this "'promotion' was nominal" because his "job duties did not change whatsoever," 56.1 Counter Stmt. ¶ 20, but it did entail a salary increase from $90,000 to $125,000 a year, Clarke Dep. Tr. at 56:17-57:24.

In April 2023, an employee in Passfeed's London office told Clarke that another London office employee had come across a Slack Channel conversation between three employees in Passfeed's China office: Sam, Bruce, and Liru. Defts. 56.1 Stmt. ¶ 27. The Slack messages were written in Chinese, but an employee in the London office translated them into English. *Id.* ¶ 29; *see* Fingerhut Decl., Exh. 7 (certified translation of the Slack Channel messages) ("Slack Conversation"). In the conversation, Liru sent Clarke's company profile picture alongside a different black man's passport photo and asked, "Is this the same person?" Slack Conversation at

1.  The other man's passport revealed that he shared Clarke's first name, Christopher, but had a different surname, which Bruce pointed out.  *Id.* at 2.  Liru said she "saw that" but insisted "it's similar," as "[t]he hairstyle, shape of the face, the beard, even the first names are the same."  *Id.*  Sam chimed in that "there's still quite a big difference"—"[o]bviously, the one on the left [*i.e.*, Clarke] is educated, and the one on the right is streetwise."  *Id.* at 3.  Liru then noted that Clarke had "said he went through underwriting for [the other man], but [also] said to pay attention to [the other man's] transactions."  *Id.*  Sam then asked, "Selling drugs?"  *Id.*  Bruce replied that, "If there are any transactions, let [Clarke] know and have him review them."  *Id.*  In an unrelated Slack message sent in a chat with the Chinese Passfeed employees, Sam also sent a screenshot from Facebook that showed three pictures of dark-skinned men and asked, "Why so dark . . . .  What's wrong with America?"  *Id.* at 5.  And at another point, Liru sent passport photos of a dark-skinned man and remarked that "[t]his guy doesn't look like a CEO."  *Id.* at 6.

On the same day that Clarke learned of the Slack conversation, he reported it to the Vice President of Passfeed's New York Office.  Dkt. 78 ("Clarke Decl.") ¶ 45.  Upon reviewing the Slack conversation, at least one Human Resources Manager in Passfeed's London office recommended that Liru be terminated, Clarke Dep. Tr. at 103:14-16, but Richard Wang—Passfeed's Chief Executive Officer—instead changed Liru's title from "Head of Treasury" to "Treasury Director" and instructed her to write an apology letter to Clarke, Defts. 56.1 Stmt. ¶¶ 39, 41; Pl. 56.1 Counter Stmt. ¶ 129.  Similarly, Bruce's title was changed from "Product Manager" to "Associate Product Manager" and he too was ordered to write an apology letter to Clarke.  Defts. 56.1 Stmt. ¶ 39; Motion, Exh. 10.[2]  Sam, for his part, was terminated, but it is unclear whether that

---

[2] Clarke received the apology letters from Liru and Bruce on August 9, 2023 and August 15, 2023, respectively.  Fingerhut Decl., Exhs. 8 ("Liru Letter"), 9 ("Bruce Letter").  Liru stated that she was "not racist towards [Clarke] or anyone else," and "express[ed] [her] sincerest apologies for using hurtful language towards [Clarke]."  Liru Letter.  Bruce stated that he was "not

was due to his participation in the Slack conversation. *Compare* Defts. 56.1 Stmt. ¶ 42 (asserting that Sam's termination was "for performance issues"), *with* Pl. 56.1 Counter Stmt. ¶ 42 (disputing this characterization), *and* Fingerhut Decl., Exh. 11 (statement from Singhania, the Talent Acquisition Manager, indicating that Sam was fired for his part in the Slack conversation). In addition to disciplining the employees in the Slack conversation, Passfeed required the entire company to undergo anti-harassment and discrimination training. Defts. 56.1 Stmt. ¶ 44. On September 15, 2023, a Human Resources Manager in Passfeed's London office informed Clarke that the company's "investigation ha[d] been completed" and that it had determined "that the kind of communications Sam, Bruce, and Liru engaged in was wrong and highly inappropriate." Fingerhut Decl., Exh. 15 (9/15/2023 email to Clarke). The Human Resources Manager assured Clarke that such conduct has "no place in our company and [is] contrary to our discrimination prevention policies." *Id.*

After Clarke reported the Slack conversation, there is no evidence that Bruce or Sam crossed paths with Clarke again. Clarke states that Liru, however, "began to create friction in the workplace, and it became increasingly difficult to work with her." Clarke Decl. ¶ 56. According to Clarke, Liru "would act unprofessionally towards me by ignoring requests to include me on communications, ignoring my requests for a meeting, and excluding me from meetings in which I should have been present." *Id.* ¶ 57; *see also* Fingerhut Decl., Exh. 22 (11/22/2023 email from Clarke to Wang expressing frustration that Liru ignored Clarke's effort to schedule a meeting). Clarke does not provide any details about how many or what kinds of meetings or communications Liru excluded him from.

---

a racist person," and that he "underst[ood] that discussing race can be hurtful, and [he] should not have done that," acknowledging that what he "said was inappropriate and insensitive." Bruce Letter.

A few months later, on or around December 15, 2023, Wang and Clarke discussed whether Clarke would be receiving an end-of-year bonus.  Clarke Decl. ¶ 67.  According to Clarke, "Wang stated, in sum and substance, that I would not receive an end of the year bonus because I complained of the Slack Channel."  *Id.*  ¶ 68.  Meanwhile, Erin Boose was hired as Passfeed's Global Human Resources Director on December 4, 2023.  Defts. 56.1 Stmt. ¶ 48.  At one point, while visiting Passfeed's London office, Boose told Passfeed employees that "Black people complain too much.  There's no racism in the US."  Clarke Dep. Tr. at 141:1-2; *see also* Fingerhut Decl., Exh. 18 ("Boose 1/31/2025 Dep. Tr.") at 73:5-7 ("Q[:] . . . .  Did you ever say, 'There is no such thing as racism in the US.  It's all media propaganda'?  A[:] It is, yes.  I do believe that.").  At her deposition on January 31, 2025, Boose clarified that she believes racism is media propaganda because she has not "personally seen racism play out," and then later acknowledged that "maybe it does, but that's my point of view."  *Id.* at 73:14-19.[3]

In December 2023, the same month when Boose was hired, Wang told Boose "that he thought that [] Clarke should be terminated," and asked Boose "to collect information on [] Clarke's performance."  Boose 1/31/2025 Dep. Tr. at 41:23-42:19.  As Defendants tell it, this was because Clarke's job performance had been lacking in several respects.  First, part of Clarke's

---

[3] In his opposition to Defendants' motion for summary judgment, Clarke asserts that Boose also said that "Meghan Markle (a Black woman) was the worst thing to happen to the Royal family" and that "the biggest problem in the United States is immigration."  Dkt. 76 ("Opposition") at 10.  To support these assertions, Clarke points to Boose's testimony during her January 31, 2025 deposition.  *Id.* (citing Boose 1/31/2025 Dep. Tr. at 72:23-73:12).  That testimony does not support Clarke's characterization in his brief, however.  When Boose was asked whether she said that "[t]he worse thing to happen to the royal family is Meghan Markle," she actually replied, "I don't think I use[d] those exact words, but I didn't think it was a net positive."  Boose 1/31/2025 Dep. Tr. at 72:23-73:1.  And Boose was never asked her views on immigration in general.  Instead, Boose was asked whether she had said that "the biggest problem in the US right now is *illegal* immigration," to which she replied only that she "*might* have said that."  *Id.* at 74:1-3 (emphases added).  Boose then clarified that she was merely "hopeful that we can get the influx of *illegal* immigration under control."  *Id.* at 75:17-18 (emphasis added).

duties included conducting background checks for employees, but he failed to do so.  *See* Fingerhut Decl., Exh. 5 ("Boose 11/20/2024 Dep. Tr.") at 98:1-7 ("Q[:] Is it your understanding that Mr. Clarke, as a chief compliance officer, should have been responsible for background checks?  A[:] Yes. . . .  And he authored a Confluence page saying that he was responsible for them.").  Clarke, however, denies that conducting background checks was among his responsibilities.  *See* Clarke Decl. ¶¶ 80-81 ("During my employment, I did not . . . execute any document accepting responsibilities for conducting background checks.  In fact, during my employment, I inquired as to why Defendant Passfeed did not conduct background checks.").

Second, Boose testified that Clarke had "self-directed that he could work from home" even though no other Passfeed employees did so, which, in turn, led employees to complain "that it's unfair that [Clarke] stays home[] and they have to come into the office."  Boose 11/20/2024 Dep. Tr. at 100:9-12, 104:9-105:14; *see also* Fingerhut Decl., Exh. 6 ("Wang 4/9/2025 Dep. Tr.") at 44:11-18 ("Q[:] . . . .  Was there an in-office requirement for Passfeed?  A[:] Yes.  Q[:] Every employee had to show up to the office?  A[:] So obviously, [an] exception would be when they are sick [so] that they don't have to, or they already asked for [the] day off, then they don't [have to be in person].  But most of the time, yes, the requirement is that the employee come to the office and work.").  In opposing Defendants' motion, Clarke admits that he "predominantly worked from home," but asserts that "Defendants widely permitted remote work, notwithstanding their policy [of having employees work in-person]."  Pl. 56.1 Counter Stmt. ¶ 61; *see* Clarke Decl. ¶ 6 ("Although Defendants purport to have a policy that in-person attendance was mandatory, in practice, employees were permitted to work from home, as was the case for two of my co-workers, Edon Jakupaj and Kuang Sein.").  But Clarke suggested at his deposition that his remote work was less frequent, explaining that "the only time I would ever work from home is if I was told it's okay.  A couple of occasions, Richard [Wang] gave me direct -- he said it was okay."  Clarke Dep. Tr. at

7

68:1-16.

Third, Boose also testified that Clarke was often unhelpful to and unresponsive with his fellow co-workers.  *See* Boose 11/20/2024 Dep. Tr. at 100:8-16 ("[Wang] said that [another Passfeed employee] was complaining about [Clarke] not helping him provide documents to partners. . . .  I, myself, noticed that [Clarke] just didn't come to meetings that I set up even though they were mandatory."); *id.* at 108:25-109:1 ("Q[:] You think [Clarke was] doing no work at all[?] A[:] Yes.").  Clarke acknowledges that he missed at least one meeting that he was supposed to attend, but insists that this was because Wang had "demanded Plaintiff prioritize speaking with an attorney pertaining to an unrelated matter."  Pl. 56.1 Counter Stmt. ¶ 58.

Wang testified that even before Boose was hired in December 2023, he had alerted Clarke to "an issue with . . . his performance" by sending him a notice letter and a warning letter.  Wang 4/9/2025 Dep. Tr. at 45:3-13.  Clarke says that he received only one written warning from Wang, on August 7, 2023.  Pl. 56.1 Counter Stmt. ¶ 62; *see* Fingerhut Decl., Exh. 16 (8/7/2023 warning letter from Wang to Clarke).  Clarke replied to Wang's warning by email, asking Wang to "[p]lease clarify the accusations of me not doing my job or leading my department effectively and professionally," Fingerhut Decl., Exh. 17, but did not receive a response, Pl. 56.1 Counter Stmt. ¶ 62.

On or around January 2, 2024, Clarke "sent a draft litigation demand letter to Defendants." Pl. 56.1 Counter Stmt. ¶ 90; *see* Clarke Decl. ¶ 70 ("On or around January 2, 2024, I, through counsel, served a letter on Defendants indicating that I may be pursuing legal action due to the racial discrimination I suffered, which was not adequately addressed, and which detailed my claims of discrimination and retaliation . . . .").  Within a couple days, Passfeed "revoked [Clarke's] access from a project [he] was working on."  Clarke Dep. Tr. at 131:19-20 (explaining that access to the project was revoked "the day after" the demand letter was sent); Clarke Decl. ¶ 76 ("On or

around January 5, 2024, I was removed from one of my projects without an explanation."). Around the same time, a Passfeed employee was assigned "to hire an individual for [Clarke's] position." Clarke Decl. ¶ 71; *see also id.* ¶ 75 ("On or around January 5, 2024, I observed an employment advertisement from Defendant Passfeed, for the same position held by me.").

On January 12, 2024, Boose told Clarke that Passfeed had decided to conduct background checks for all current and prospective employees in the United States. *Id.* ¶ 77. Defendants assert that Clarke's background check was able to verify only one past employer—a company called "Randstad US, LLC." Defts. 56.1 Stmt. ¶ 14; *see* Fingerhut Decl., Exh. 3 ("Clarke Background Check") at 3. Clarke, however, notes that the copy of the background check submitted by Defendants reflects a "see more" hyperlink that had not been clicked, suggesting that the full report may reveal additional past employers. Pl. 56.1 Counter Stmt. ¶ 14; *see* Clarke Background Check at 4. Clarke's background check also did not reveal that he received a bachelor's degree from Seton Hall University, *see* Clarke Background Check at 4, even though his resume had stated "Bachelor's Degree | December 2022" under the header "Seton Hall University," Resume at 2.

Around this same time, as a result of "collect[ing] information on [] Clarke's performance," Boose 1/31/2025 Dep. Tr. at 42:14, Boose came to the view that Clarke should be terminated, *see* Boose 11/20/2024 Dep. Tr. at 107:22-24. But Boose did not expressly recommend to Wang that he fire Clarke. *See id.* at 107:25-108:7 ("Q[:] Did you tell that to Mr. Wang? A[:] I never like to give what I think should be done. I present facts and let someone else make the decision. Q[:] Sure. Did you present your opinions to Mr. Wang about Mr. Clarke? A[:] I went over things that I thought needed extra guidance and/or needed coaching."); Wang 4/9/2025 Dep. Tr. at 70:5-7 ("Q[:] Did [Boose] help you make the decision to terminate Mr. Clarke? A[:] She really only provided some suggestions."). Wang ultimately concluded that Clarke should be fired. *See* Motion, Exh. 19 ("Wang 10/10/2024 Dep. Tr.") at 78:18-22 ("I made the decision [to fire

9

Clarke].").

On or around January 22, 2024, Clarke was disconnected from Passfeed's Slack communications and lost access to his work email account. Clarke Decl. ¶ 82. Upon arriving at Passfeed's office, Boose told Clarke that he had been fired, citing "performance issues." *Id.* ¶¶ 83-84. Clarke then asked for documentation confirming his termination, so Boose emailed Clarke a termination letter drafted by an attorney on January 24, 2026. *See* Boose 1/31/2025 Dep. Tr. at 51:21-53:8.

## B.     Procedural History

On January 26, 2024, just days after his termination, Clarke brought this case against Passfeed, Wang, and Boose. Dkt. 1 ("Compl."). The Complaint alleges ten causes of action: (1) race discrimination in violation of Section 1981 against all Defendants, Compl. ¶¶ 112-117 ("Count One"); (2) retaliation for opposing unlawful discrimination in violation of Section 1981 against all Defendants, *id.* ¶¶ 118-122 ("Count Two"); (3) race discrimination in violation of the NYSHRL against all Defendants, N.Y. Exec. L. § 296(1)(a), Compl. ¶¶ 123-126 ("Count Three"); (4) retaliation for opposing unlawful discrimination in violation of the NYSHRL against all Defendants, N.Y. Exec. L. § 296(1)(e), (7), Compl. ¶¶ 127-130 ("Count Four"); (5) aiding and abetting unlawful discrimination in violation of the NYSHRL against Wang, N.Y. Exec. L. § 296(6), Compl. ¶¶ 131-134 ("Count Five"); (6) aiding and abetting unlawful discrimination in violation of the NYSHRL against Boose, *id.* ¶¶ 135-138 ("Count Six"); (7) race discrimination in violation of the NYCHRL against all Defendants, N.Y.C. Admin. Code § 8-107(1)(a), Compl. ¶¶ 139-142 ("Count Seven"); (8) retaliation for opposing unlawful discrimination in violation of the NYCHRL against all Defendants, N.Y.C. Admin. Code § 8-107(7), Compl. ¶¶ 143-146 ("Count Eight"); (9) aiding and abetting unlawful discrimination in violation of the NYCHRL against Wang, N.Y.C. Admin. Code § 8-107(6), Compl. ¶¶ 147-150 ("Count Nine"); and (10)

10

aiding and abetting unlawful discrimination in violation of the NYCHRL against Boose, *id.* ¶¶ 151-154 ("Count Ten").

Defendants filed their operative answer on April 12, 2024. Dkt. 19. Discovery closed on April 7, 2025. Dkt. 54 (case management plan); *see* Dkts. 62 (4/14/2025 letter from Clarke's counsel confirming that the parties completed fact discovery and were not conducting expert discovery), 63 (4/15/2025 order deeming all discovery closed). Defendants moved for summary judgment on June 11, 2025. Dkts. 70-72. Plaintiff responded on July 11, 2025. Dkts. 75, 76 ("Opposition"), 77. Defendants replied on July 25, 2025. Dkts. 81-82, 83 ("Reply").

## II. Legal Standard

The Court grants summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 620 (2d Cir. 2016) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'" *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In conducting this review, the Court must "resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Mhany Mgmt.*, 819 F.3d at 620.

"The movant bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,' and, if satisfied, the burden then shifts to the non-movant to present 'evidence sufficient to satisfy every element of the claim.'" *Chen*, 2019 WL 1244291, at *4 (quoting

*Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)).  The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (cleaned up).  The non-movant must present more than a "scintilla of evidence" to survive summary judgment.  *Anderson*, 477 U.S. at 252.  "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (cleaned up).

### III.  Discussion

For purposes of this Opinion and Order, the Court divides Clarke's claims into two groups: (1) his federal law claims under Section 1981 and (2) his claims under state and city law.  The Court considers these two sets of claims in turn.

**A.      Section 1981**

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  Enacted in 1866, "the Act was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race."  *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976).

As relevant here, a plaintiff may bring two kinds of claims for employment discrimination under Section 1981.  First, a plaintiff may bring a claim of direct discrimination—*i.e.*, that, on account of his race, he was treated differently in "the making, performance, modification, and termination of contracts" or "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b) (defining the right to "make and enjoy contracts").  Second, a plaintiff may bring a claim of retaliation—*i.e.*, that he was punished for "advocat[ing]

12

the rights of groups protected by [Section 1981]." *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 447 (2008); *see id.* at 451, 457 (recognizing that the Civil Rights Act of 1991's amendment of Section 1981 allowed plaintiffs to bring retaliation claims). Here, Clarke brings both claims of direct discrimination and retaliation.

### 1. Scope of Coverage

Defendants argue that, as a threshold matter, Section 1981 does not "apply[] to this litigation." Motion at 2. Defendants first argue that Section 1981 does not cover at-will employees such as Clarke. Motion at 11-12. But as Defendants concede in their Reply, such a categorical statement is incorrect. Reply at 1 ("Defendant[s] agree that . . . the at-will employment contract governed by New York law constitutes a 'contract' for purposes of Section 1981."); *see Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 68 (2d Cir. 2000) ("[A]n at-will employment agreement governed by New York law constitutes a 'contract' within the meaning of 42 U.S.C. § 1981."); *Lauture v. IBM Corp.*, 216 F.3d 258, 261-64 (2d Cir. 2000) (same).

Defendants also argue that Section 1981 does not apply "when the employee provides false information to the potential employer, thus creating a voidable contract." Motion at 12-14 (citing *Fair Emp. Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268 (D.C. Cir. 1994); *Kawitt v. United States*, 842 F.2d 951 (7th Cir. 1988)); *accord* Reply at 1-4. Defendants do not identify any controlling authority for this exception to Section 1981's scope. *See* Opposition at 3 (noting that the caselaw cited by Defendants does not "constitute controlling authority for this Court"). But even assuming such an exception exists, it would not provide a basis for granting summary judgment because there is a genuine dispute as to whether Clarke provided false information to Passfeed when he applied for the job. Although Clarke's resume listed "Bachelor's Degree | December 2022" under the header "Seton Hall University," Resume at 2, Clarke testified that he disclosed to Singhania during the interview process that that he had not in fact graduated

13

from Seton Hall University, Clarke Dep. Tr. at 39:23-40:5—a contention that Singhania corroborates, *see* Fingerhut Decl., Exh. 20 (6/12/2024 email stating: "I acknowledge, that before the interview, Mr. Clarke disclosed that the graduation date listed on his resume was outdated due to personal reasons requiring him to take time off school."). There is also a genuine dispute about whether the "Work Experience" section of Clarke's resume contained false information. *See* Resume at 1-2. Clarke attested that he in fact worked at the financial institutions listed on his resume, even though some of those jobs were contract work through staffing agencies. Clarke Decl. ¶¶ 7-16; Fingerhut Decl., Exh. 4 (offer letter to Clarke for one of those financial institutions via a staffing agency). And although Defendants argue that Clarke's background check did not confirm his listed experience, *see* Motion at 3, that is not apparent from the printout of the background check submitted to the Court, which appears to be an incomplete version of the report. *See* Clarke Background Check at 4 (reflecting an unclicked hyperlink allowing the user to "see more").

The Court thus declines to grant Defendants' motion for summary judgment on the basis that Clarke is not protected by Section 1981.

### 2.    Direct Discrimination

#### a.    Legal Standard

Section 1981 allows liability for direct race discrimination in employment under theories of disparate treatment and hostile work environment. *See, e.g.*, *Knox v. CRC Mgmt. Co., LLC*, 134 F.4th 39, 45-52 (2d Cir. 2025) (discussing both theories). To prove disparate treatment, a plaintiff's first step "is to establish a prima facie case of discrimination by showing that (1) she is a member of a [racial minority]; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Bart v. Golub Corp.*, 96 F.4th 566, 570 (2d Cir. 2024) (internal quotation marks omitted) (applying Title

14

VII); *see also Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981."). "Once the plaintiff has established a prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its adverse action." *Bart*, 96 F.4th at 570 (internal quotation marks omitted). "Upon that showing, the burden then shifts back to the plaintiff to prove that the employer's stated reason was pretext for discrimination." *Id.*

"[A] plaintiff must establish two elements to prove a hostile work environment" under Section 1981: (1) that "harassment [based on the plaintiff's race] was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment"; and (2) that there is "a specific basis for imputing the hostile work environment to the employer." *Lamarr-Arruz v. CVS Pharmacy, Inc.*, 271 F. Supp. 3d 646, 655-56 (S.D.N.Y. 2017) (citation modified). With regard to the first element, "isolated incidents ordinarily will not rise to the level of a hostile work environment, [but] even a single incident of sufficient severity may so alter the terms and conditions of employment as to create such an environment." *Patterson*, 375 F.3d at 227. With regard to the second element, where harassment was due to the conduct of "a co-worker and not a supervisor, [a] plaintiff[] must demonstrate that [her employer] either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Whidbee*, 223 F.3d at 72 (internal quotation marks omitted). Unlike a Title VII claim, in which an employer may be liable if it is "negligent in responding appropriately to a complaint of racial harassment," a plaintiff "pursuing a claimed violation of § 1981 . . . must show that the discrimination [by his employer] was intentional." *Patterson*, 375 F.3d at 226 (citation modified).

### b. Analysis

Clarke argues that he was subjected to a hostile work environment, Opposition at 8-12,

15

and, "[i]n the alternative," that "he has established a *prima facie* case under the theory of disparate treatment," *id.* at 12.  With regard to his hostile work environment theory, the Court directs Clarke to show cause whether a reasonable factfinder could find for him based on the current record.

To be sure, the Slack messages between Liru, Bruce, and Sam were offensive, but none of those employees was Clarke's supervisor.  Clarke's Section 1981 claim therefore requires him to "demonstrate that [his employer] either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it."  *Whidbee*, 223 F.3d at 72 (internal quotation marks omitted).  There appears to be no dispute that, after Clarke reported the Slack conversations, Liru, Bruce, and Sam were either fired or given a lesser title and forced to write Clarke an apology.  Defts. 56.1 Stmt. ¶¶ 39-42.  It is also appears to be undisputed that, in response to this incident, Passfeed required the entire company to participate in anti-harassment and discrimination training.  *Id.* ¶ 44.

Clarke argues that Passfeed failed to promptly respond to his complaints and that Liru continued to treat him rudely, even after her title was changed and she was forced to apologize.  Opposition at 10-12.  Clarke has not explained, however, why Liru's failure to invite him to meetings after she was disciplined was the kind of harassment that is "so severe or pervasive as to create an objectively hostile or abusive work environment."  *Patterson*, 375 F.3d at 227 (internal quotation marks omitted).  Nor has Clarke pointed to more severe harassment that persisted in the period before Passfeed disciplined those involved in the offensive Slack communications.  Finally, even if there were a genuine dispute as to whether Passfeed was negligent in responding to Clarke's complaints, Clarke still must show that Passfeed's response was so lacking that it amounted to an intentional decision to allow the harassment to persist.  *See id.* at 226 ("[A] plaintiff pursuing a claimed violation of § 1981 or denial of equal protection under § 1983 must show that the discrimination was intentional.").

16

Clarke also argues that Boose's statement that "[t]here's no racism in the US," Clarke Dep. Tr. at 141:1-2, suffices to show a hostile work environment.  This comment was not "of such severity and character as to itself subvert the plaintiff's ability to function in the workplace." *Alfano v. Costello*, 294 F.3d 365, 380 (2d Cir. 2002).  In fact, Boose testified at her deposition that she was stating only her belief that she had never "*personally* seen racism play out."  Boose 1/31/2025 Dep. Tr. at 73:14-15 (emphasis added).  Nor is the Court aware of any decision finding a hostile work environment based on a supervisor's expression of an opinion about a matter of public concern such as the extent of racism in American society.  *Cf. Finkelshteyn v. Staten Island Univ. Hosp.*, 687 F. Supp. 2d 66, 71, 78 (E.D.N.Y. 2009) (finding statements that pertained to a "political dispute" insufficient to support a hostile work environment claim).  And even if such a comment could theoretically contribute to a hostile work environment, the comment, taken on its own, does not appear to create a dispute of fact as to whether a hostile work environment existed. *See Patterson*, 375 F.3d at 227 ("[I]solated incidents ordinarily will not rise to the level of a hostile work environment.").

Finally, the evidence in support of a disparate treatment argument theory under Section 1981 does not appear to fare better.  In his opposition to Defendants' motion, Clarke does not identify any adverse employment action that was the result of Defendants' intentional discrimination.  To be sure, Clarke was denied a bonus in December 2023 and terminated in January 2024, but he has not pointed to evidence indicating that these adverse actions were the result of his race, as opposed to his complaints about the Slack conversation.

Notwithstanding the above, Defendants did not make these arguments in support of their motion, and thus Clarke did not have an opportunity to respond to these grounds for granting summary judgment.  The Court therefore will afford the parties an opportunity to address these issues.  No later than April 30, 2026, Clarke is ordered to show cause why his claim for direct

17

discrimination under Section 1981 should not be dismissed for the reasons set forth above. Defendants may submit a response by May 14, 2026, and Clarke may submit a reply by May 21, 2026.

### 3.    Retaliation

#### a.    Legal Standard

"To establish retaliation [under Section 1981], [a] plaintiff[] must show that [he] (1) [opposed the violation of a right] protected under [Section 1981], (2) the defendants were aware of [his] participation in th[at] protected activity, (3) the defendants took adverse action against [him] based upon [his] activity, and (4) a causal connection existed between [his] protected activity and the adverse action taken by defendants." *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 105 (2d Cir. 2001). Individual liability under Section 1981 is particularly relevant to the Court's consideration of Clarke's federal retaliation claim. "[I]ndividuals may be held liable under § 1981," but a plaintiff must demonstrate "some affirmative link to causally connect the actor with the discriminatory action." *Whidbee*, 223 F.3d at 75 (internal quotation marks omitted). In other words, a "claim seeking personal liability under section 1981 must be predicated on the actor's personal involvement." *Id.* (internal quotation marks omitted); *see also Hicks v. IBM*, 44 F. Supp. 2d 593, 597 (S.D.N.Y. 1999) ("In each of the cases that have allowed individual liability, the individuals have been supervisors who were personally involved in the discriminatory activity.") (collecting cases).

#### b.    Analysis

The Court grants summary judgment on Clarke's Section 1981 retaliation claim as to Boose but otherwise denies Defendants' motion. As an initial matter, the Court rejects Defendants' argument that "[o]nce [Clarke] was turned down for a bonus," he "set up Defendants to try to protect his position in the company." Motion at 17. No evidence supports Defendants' far-fetched

18

theory that Clarke schemed to "set up Defendants." *Id.*

Next, there is at least a triable issue of fact as to whether the decision to deny a bonus to, and then ultimately to terminate, Clarke was retaliation by Passfeed and Wang for Clarke's complaints about the racially offensive Slack conversations. Although Defendants have presented evidence suggesting that these adverse actions were taken due to legitimate performance reasons, Clarke has come forward with evidence suggesting otherwise. Most notably, Clarke has averred that Wang told him he was denied a bonus because of he complained about that offensive exchange over Slack. Clarke Decl. ¶¶ 67-68 (attesting that Wang stated that Clarke "would not receive an end of the year bonus because [Clarke] complained of the Slack Channel"). Similarly, and within only a few days after Clarke sent Defendants a draft litigation demand letter revealing that he was considering legal action due to race discrimination and retaliation, *see* Pl. 56.1 Counter Stmt. ¶ 90; Clarke Decl. ¶ 70, he was removed from a project he was working on and learned that Passfeed was attempting to hire his replacement, *see* Clarke Dep. Tr. at 131:17-20; Clarke Decl. ¶¶ 71, 76. And then, only about twenty days after sending that letter threatening litigation, Clarke's employment at Passfeed was terminated, Clarke Decl. ¶¶ 82-84; Boose 1/31/2025 Dep. Tr. at 51:21-53:8—a decision made by Wang, Wang 10/10/2024 Dep. Tr. at 78:18-22. Given the temporal proximity between the adverse actions and the protected activity, the evidence of Wang's personal involvement in the denial of Clarke's bonus and the decision to terminate Clarke, and the material dispute as to the reason for his ultimate termination, Clarke's Section 1981 retaliation claim survives summary judgment as to Passfeed and Wang.

As to Boose, however, Clarke has not shown her personal involvement in any discriminatory activity. *See Hicks*, 44 F. Supp. 2d at 597. To be sure, Boose "collect[ed] information on [] Clarke's performance," Boose 1/31/2025 Dep. Tr. at 42:13-15, and the information Boose gathered very well may have made Clarke's firing more likely. But Clarke has

19

presented no evidence suggesting that "a causal connection existed between" Clarke's complaints about discrimination—*i.e.*, the protected activity—and Boose's involvement in any decision to terminate his employment. *See Lizardo*, 270 F.3d at 105. The undisputed evidence demonstrates that it was not Boose's decision to gather information about Clarke; rather, she was directed to do so by Wang. Boose 1/31/2025 Dep. Tr. at 41:23-42:19. And while Boose presented concerns to Wang regarding Clarke's work performance, she did not even recommend Clarke's termination, Boose 11/20/2024 Dep. Tr. at 107:20-108:7, and the termination decision was made by Wang—not her, Wang 4/9/2025 Dep. Tr. at 70:5-7; Wang 10/10/2024 Dep. Tr. at 78:18-22. The Court therefore grants summary judgment to Boose on Clarke's claim for Section 1981 retaliation but otherwise denies Defendants' motion on this issue.

## B.    State and City Law Claims

Clarke's remaining claims arise under the NYSHRL and the NYCHRL. But "[f]or a non-resident of New York . . . to bring a claim under either the NYSHRL or NYCHRL, the non-resident must plead and prove that the alleged discriminatory conduct had an impact in New York State (as to the NYSHRL) or New York City (as to the NYCHRL)." *Trotter v. Nat'l Football League*, 737 F. Supp. 3d 172, 192 (S.D.N.Y. 2024) (internal quotation marks omitted). In *Hoffman v. Parade Publications*, the New York Court of Appeals applied this standard to conclude that a plaintiff's claims should be dismissed even though the defendant-employer was headquartered in New York, the decision to terminate the plaintiff was made in New York, all management decisions were made from New York, and the plaintiff attended quarterly meetings in New York. 933 N.E.2d 744, 745 (N.Y. 2010). Similarly, in *King v. Aramark Services Inc.*, the Second Circuit held that "New York's connection to [the plaintiff's] claims [was] too tenuous to give rise to [NYSHRL] liability" even though the defendant-employer "permitted [the plaintiff] to do some of her work from her New York residence, and some of the discriminatory conduct [the plaintiff]

20

alleges took place while she was working from her New York home office."  96 F.4th 546, 557-58 (2d Cir. 2024) (emphasis omitted).

Here, Clarke is a resident of Bergen County, New Jersey, Compl. ¶ 8, and has represented that he "predominantly worked from home," Pl. 56.1 Counter Stmt. ¶ 61.  Thus, even though Clarke was employed through Passfeed's New York office, sometimes worked at that office, and was ultimately fired in the New York office, there is reason to believe that the impact of the alleged discrimination occurred in New Jersey—not New York.  Neither party raised this issue in their briefing, however.  Accordingly, Clarke is ordered to show cause by April 30, 2026, why his claims under the NYCHRL and the NYSHRL should not be dismissed due to the fact that the impact of the alleged discrimination did not occur in New York State or New York City.  Defendants may submit a response by May 14, 2026, and Clarke may submit a reply by May 21, 2026.

## IV.  Conclusion

For the above reasons, the Court grants summary judgment in favor of Boose on Clarke's claim for retaliation under Section 1981, but otherwise denies Defendants' motion for summary judgment.  Clarke is ordered to show cause by April 30, 2026, why the Court should not dismiss his claims for direct discrimination under Section 1981 and his claims under the NYSHRL and the NYCHRL.  The Clerk of Court is respectfully directed to close Docket Number 70.

SO ORDERED.

Dated: March 31, 2026
New York, New York

_____
JOHN P. CRONAN
United States District Judge

21